To His Excellency, Charles Dean Kimball, Governor of the State of Rhode Island and Providence Plantations.
The request of your excellency for an opinion upon the constitutionality of chapter 1004 of the Public Laws, entitled "An act to regulate the hours of labor of certain employees of street railway corporations," calls for a critical examination of the provisions of a penal statute enacted on April 4, 1902, to take effect on June 1, 1902.
The corporations referred to in the act are quasi-public corporations, and their property is in a large measure impressed with a public use. And it is indisputable, as a general proposition, that, where peculiar privileges are granted by the State, peculiar responsibilities supervene and special regulations may be prescribed; for the bestowal and reception of special privileges beget legitimately the right to impose special burdens. But the right to restrict is not an unlimited right. The restrictions must apply equally to all under the same conditions, since otherwise there is a denial of that equal protection of the laws which is guaranteed by the constitution of the United *Page 610 
States (article 14 of amendments, section 1), which, being by its own terms the supreme law of the land, is, in a sense, also incorporated into the constitution of this State. For article 6 of the constitution of the United States provides as follows: "This constitution . . . shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."
Upon the question of the right to restrict the liberty of contract in a lawful calling, as between employers and employees, the decisions of the courts of different States are in conflict. When these restrictions fall equally upon all in the same circumstances, there are authorities which sustain the right of the legislature to impose them. But even this right is not universally conceded. Judge Cooley, in his great work on Constitutional Limitations, 6th ed. p. 484, says: "The doubt might also arise whether a regulation made for any one class of citizens entirely arbitrary in its character and restricting their rights and privileges or legal capacity in a manner before unknown by the law, could be sustained notwithstanding its generality. Distinctions in these respects must rest upon some reason upon which they can be defended, like the want of capacity in infants and insane persons; and if the legislature should undertake to provide that persons following some special lawful trade or employment should not have capacity to make contracts or to build such houses as others were allowed to erect, or in any other way make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative authority, even though no express constitutional provision could be pointed out with which it must come in conflict. To forbid an individual or a class the right to the acquisition and enjoyment of property in such manner as should be permitted to the community at large, must be to deprive them of liberty in particulars of primary importance to their pursuit of happiness; and those who shall claim a right to do so ought to be able to show specific authority therefor, instead of calling upon others to show how and where the authority is negatived." *Page 611 Ritchie v. People, 155 Ill. 98; In Re Morgan, 26 Col. 415;Low v. Rees Printing Co., 41 Neb. 137.
The act itself contains no explanation of the exigency for its passage, but it is contended that it is fully justified as a valid exercise of the police power of the State; and if that contention be made good, the act must unquestionably be upheld. Two grounds only are urged, or, indeed, exist, in support of the act as a police regulation, viz., the public safety and the somewhat more doubtful ground of the health of the employees; and if either or both of these are found upon examination to be the uniform and controlling objects to be subserved, and if its provisions bear alike under the same conditions upon all who are within its terms, and if, in its classifications, it includes all who are under the same conditions and excludes none of those whose conditions or needs render such legislation necessary or appropriate to them as a class, sufficient justification for the enactment may be found.
But the validity or invalidity of such an act as this may, and often does, depend upon the facts disclosed in the particular case before the court. This not being an adversary proceeding, such facts only can be properly considered as are of common knowledge or of public record, or, it may be, such as have come to our notice in the course of judicial proceedings before us. Nor is precedent wanting for considering other matters than the express provisions of the act; for in the case of Atchison;Topeka Santa Fe Railroad Company v. Matthews, decided in 1898 (174 U.S. 96), the Supreme Court of the United States, approving Yick Wo v. Hopkins, 118 U.S. 356, says: "In that case a municipal ordinance of San Francisco, designed to prevent the Chinese from carrying on the laundry business, was adjudged void. This court looked beyond the mere letter of the ordinance to the condition of things as they existed in San Francisco and said that under the guise of regulations an arbitrary classification was intended and accomplished."
While the language of the act is not entirely clear in all its parts, it may fairly be said that it prohibits in its terms all officers and agents of street railway corporations from "exacting" *Page 612 
from certain classes of their employees, viz., conductors, gripmen, and motormen, more than ten hours' labor in twelve consecutive hours in any day of twenty-four hours, with certain exceptions. And it undoubtedly follows that if the corporation cannot require, as of right, from the employee longer service than this, that the employee cannot make a valid contract with the corporation for such longer service; for a contract must be mutually enforcible to be binding on the parties to it.
It will not be questioned that the act is to be strictly construed, since it is penal in its nature, and it is therefore to be noted:
First. That it is restricted in its application to and includes only street railway corporations and three classes of persons in their employ, namely, conductors, gripmen, and motormen.
And thus our first inquiry is as to the necessity for thus restricting the natural liberty of contract between the employer and the man of full age whom he employs. This freedom of contract is still left unrestricted in the other avocations of our people, and this statute constitutes an unique exception to the otherwise universal rule. Has the policy hitherto pursued in this respect proved detrimental to the public welfare, or are these employees so many in point of numbers as to properly require special legislation as a class, or is the operation of street railways so related to the public safety that the dangers arising therefrom require, and therefore justify, these restrictions on the liberty of contract between these companies and their employees, or is the act found to be not justified by any of these considerations?
If evidence be desired of the prosperity which has resulted to our people under the relations which have heretofore existed between employer and employee, it may be found in the records of the United States census of 1900 (Bulletin 93, pp. 3 and 5), summarized in these words: "In the percentage of the total population employed in manufacturing, in the variety and importance of products . . . Rhode Island is not surpassed." . . . "It is doubtful whether so large a share of the material wealth and resources of any other commonwealth can be *Page 613 
attributed to the enterprise and skill of its citizens in the enlargement and extension of old and established industries and the development of new forms of productive industry." It therein appears (Table 6) that out of the total population of 428,556 people of this State, there were 64,508 wage-earning male employees over sixteen years of age employed in the mechanical and manufacturing industries of the State alone, without reference to those employed in agricultural or other pursuits, to no one of whom does any law restricting his right to contract as to his hours of labor apply.
The act in question was passed on April 4, 1902, which was the last day of the January session of the General Assembly. The official report of the State railroad commissioner for the year 1901, concerning "The condition and proceedings of the several railroad corporations" of the State, which is required by chapter 809 of the Public Laws to be made to the General Assembly at its January session, had therefore been in its possession for the maximum period, and that body is chargeable with notice of its contents. It therefore becomes especially appropriate to consider that report, in order, if possible, that it may be seen in what manner and to what degree it may show that the public safety was endangered by the operation of the street railway companies in the State; for when actual knowledge is shown the legal presumption of knowledge no longer obtains. It there appears (page 74) that there are nine street railway companies, operating within the limits of the State 753 motor cars and 93 other cars (such as construction and sand cars, etc.), or 846 cars of all descriptions. The danger to public safety arising from the operating of street railways, and arising otherwise than from defective construction or repair of roadbed or equipment, with which motormen, gripmen, and conductors are in nowise concerned, must, therefore, be caused by these 846 cars; and the total number of persons subject to the provisions of the act is the number required to operate them, which is evidently a very small percentage of the total population of the State. Now, if special and peculiar dangers affecting the public safety attend upon the operation of street railways, and these dangers will be *Page 614 
remedied by restricting the liberty of contract between the companies and the three classes of employees above mentioned in manner and form as contained in this act, such dangers will doubtless constitute sufficient justification for so doing; but otherwise the exigency for such special and class legislation is not apparent. Fortunately, exact statistics showing the degree of danger to the public safety are at hand; for on page 75 of this report it appears that there were transported in the year ending June 30, 1901, on all the street railroads in the State, the great number of 58,924,846 passengers, and that, in so doing (page 77), twelve persons were killed from all causes, and 204 were injured more or less seriously — these figures including employees, passengers, and the general public. Of those killed only 7, and of those injured only 147, were killed or injured respectively by collision or while crossing tracks; other deaths and injuries being caused by leaving or boarding the cars while in motion, derailments, and other causes, or a total of 154 persons in all. It is impossible to escape the conclusion that the greater or less degree of injury sustained by 147 persons and the loss of 7 lives, within the period of one year, while transporting 58,924,846 passengers on the 316 miles of track in this State (page 74) by the nine street railway corporations, constitutes the exact measure of danger to the public safety for one year which arises from the operation of all the street railway companies within the limits of the State.
Second. But the act is still further restricted in its application in this — that it does not include all conductors and motormen generally, but applies to and includes only those who are employed in operating street railways. But there are others of these classes in the State who are not employed in operating street railways. In a recent hearing before the undersigned, it appeared from the testimony that the Providence, Warren Bristol Railroad is now operated by the New York, New Haven Hartford Railroad Company, a steam railroad company, by means of electricity supplied by the overhead trolley system, and it employs in its operation conductors and motormen whose duties are similar to the duties of the *Page 615 
conductors and motormen engaged in operating street railways. But their cars run over their own roadbed, and not through the streets in the towns through which they pass; neither is the rate of speed of their cars subject to local regulation; that 98 trains are operated on that road in a day of eighteen hours, carrying on an average about 8,000 passengers per day, or at the rate of nearly 3,000,000 per annum — the number carried on July 4, 1901, being 57,000, and on labor day, 1901, over 65,000. But this act does not apply to conductors or motormen, or protect the passengers, on that road. And while the danger of collision is less than on a street railway, the high and unlimited rate of speed which is maintained and the dangers and consequences thereof are far greater. So that it is not amiss to inquire the reason for neglecting to extend these provisions for the health of employees and the safety of passengers to this road also.
It is also a matter of common and general knowledge and public record, to which it does not seem improper to refer, that the Bristol branch of the Rhode Island Suburban Railroad Company operates a parallel electric street railway, from a point a few rods distant from the latter road in Providence, through the highways in the towns of East Providence, Barrington, and Warren, to a point a few rods distant at its Bristol terminus, and this road is undoubtedly within the provisions of this act. But it is also a matter of common and general knowledge, and of public record, that the same Rhode Island Suburban Railroad Company has recently extended its operations by the electric trolley system upon the tracks and roadbed of the former Warwick Oakland Beach Railroad Company, and is undoubtedly not a street railway as to such branch, and its motormen and conductors and the public generally are not in the least affected by the act under consideration. Thus this anamoly is presented — that the same corporation is liable to the penalties prescribed in this act if it "exacts" more than ten hours' daily service on its road in the town of Bristol, but is not so liable on its road in the town of Warwick. Substantially similar conditions exist on the Sea View Railroad running to Narragansett Pier, which *Page 616 
is also operated by electricity in the same manner and employs conductors and motormen, but operates its cars on its own roadbed and not upon the public highways, except at occasional intervals and for very short distances, and which, according to the same report (page 90), transported 433,315 passengers in 1901.
Having thus described the existing conditions attendant upon the operation of the act, we are now better prepared to consider the language of the act itself.
And here another exception appears, for the act does not include in its provisions even all those conductors and motormen who are engaged in operating street railways; since, by the express proviso to section 1, "Nothing herein contained shall affect existing contracts." That is to say, if a motorman or conductor in the employ of a street railway company had a "written contract" with the company on June 1, 1902, for a greater number of hours of labor than ten per day, it is still lawful for the company to "exact" more than ten hours' labor per day from such persons; while in the case of a conductor or motorman operating on the same route, and it may be on the same car, but then having only an oral contract with the company, though made on the same day and calling for the same length of service and made upon the same consideration, the company is liable to a fine of $500.
This act was passed on April 4, 1902, and it is of course not known to us how many "written contracts" with employees were thereafter made or were in existence on June 1, 1902; and it is therefore not within our knowledge how many of these classes of employees who were originally required to operate the 846 cars aforesaid are still exempt from its operation. But to exempt from the operation of the act solely because of having a written contract with the corporation is wholly indefensible and is purely an arbitrary classification, for no reason germane to the public safety or the health of the employees; for nothing is more clearly settled than that a valid exercise of the police power is not subject to the constitutional provision prohibiting legislation which impairs the obligation of contracts, since all contracts are made, as all *Page 617 
property is held, subject to the paramount requirements of the police power of the State. The Supreme Court of the United States in New Orleans Gas Company v. Louisiana Light Company, 115 U.S. p. 672, says: "The constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts." So that the question here presented is not as to the scope of the police power in general, but is limited to an inquiry, in the first place, as to whether existing conditions are such as to justify its exercise at all because of some sufficient danger to the public safety; and, if that be so, in the next place to an inquiry whether it can be exercised in manner and form as expressed in the provisions of the penal statute before us; or, in other words, is the act intended to protect the public safety, and then, do its provisions accomplish that intent? Unless both these inquiries can be answered in the affirmative, the act fails of justification; for even if the danger to the public safety is shown to be a real and substantial danger, nevertheless, if the means adopted for its removal do not accomplish its removal, the public safety still remains impaired, society is not protected, and the real and effective power of the police power has not been effectively applied. But in what manner is the public safety preserved or the health of the employees protected by these exceptions to the provisions of the act ? Or will it be seriously contended that the obligation of the oral contract is not protected by the constitution, while the obligation of a written contract is so protected?
Third. But these are not the only exceptions, since the act is periodically suspended in its application to even those motormen and conductors who have not been exempted from its terms by the exceptions already considered; for, in addition to cases of unexpected contingency which need not be further mentioned, it is provided: "That on legal holidays . . . extra labor may be performed for extra compensation." Section 36 of chapter 809 of the Public Laws prescribes *Page 618 
the legal holidays in this State, and includes, together with eight other days, "the first day of every week commonly called Sunday," of which, of course there are fifty-two in the year, thus leaving the act operative as to those motormen and conductors on only 305 days out of 365 days in the year. With the religious and moral issues involved in thus authorizing unlimited exactions of service to be made on that day we are not now concerned, for the legal question would be the same if the law were periodically inoperative by arbitrary enactment for one sixth of the total number of week days in the year. But it is needless to say that neither the public safety nor the health of the employee is conserved thereby. And this is especially true when it is considered that the very days when the law does not apply are precisely those days when the largest crowds are upon the cars and upon the streets and when the dangers of transportation and collision are at the maximum.
In Atchison, Topeka Santa Fe Railroad v. Matthews,supra, the Supreme Court of the United States thus defines the limits of the police power: "It is also a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it has transcended its power. On the other hand, it is also true that the equal protection guaranteed by the constitution forbids the legislature to select a person, natural or artificial, and impose upon him or it burdens or liabilities which are not cast upon others similarly situated." . . . "Neither can it make a classification of individuals or corporations which is purely arbitrary and impose upon such class special burdens and liabilities. Even when the selection is not obviously unreasonable and arbitrary, if the discrimination is based upon matters which have no relation to the object sought to be accomplished, the same conclusion of unconstitutionality is affirmed."
Says Mr. Justice Field in Butchers Union Company v.Crescent *Page 619 City Company, 111 U.S. p. 757, citing with approval Adam Smith's "Wealth of Nations," Book 1, cap. 10: "It has been well said `that the property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders one from working at what he thinks proper, so it hinders the others from employing whom they think proper.'"
Under the provisions of this act certain motormen and conductors, by virtue of the "written contracts" in existence on June 1, 1902, are permitted to contract without restriction for such hours of labor as they may see fit, while all others in the same class have unlimited freedom of contract in this behalf on only 60 days in the year, and are restricted for the remaining 305 days in the year.
In Carr v. Brown, 20 R.I. 215, the court decided that a certain statute operated to deprive the plaintiff of property "contrary to the law of the land, or, as it is ordinarily said, without due process of law, and hence is in violation of article 1, section 10, of the constitution of this State, and also of article 14 of the amendments to the constitution of the United States." In Mitchell v. Peoples Saving Bank, 20 R.I. p. 507, the court construed the provisions of article I, section 10, of the constitution of this State as follows: "That which the constitutional provision is intended to perpetuate is the substance of the individual right of property," and to my mind this constitutional guaranty is directly broken by the act under consideration; and see State v. Dalton, 22 R.I. p. 79.
Fourth. But the act not only restricts the hours of labor to ten in a day of twenty-four hours, but it requires that those ten hours of labor shall be performed within twelve *Page 620 
consecutive hours. In the case of those cars which are operated at night, a motorman or conductor who begins his ten hours of labor at 6 P.M. must therefore work all night until, at the earliest, 6 A.M., or at the latest until 6 A.M. In what way can it be said that the health of the employee is preserved by such a requirement, as against a schedule permitting the same employee to work for five hours from 6 P.M. to 11 P.M., and then resuming at 8 A.M.; and working the remaining five hours until 1 P.M., thus affording nine hours for sleep and morning meal, and ending in time for the midday meal? Or is the public safety in any wise conserved by thus requiring a motorman to be on what is practically continuous duty throughout the darkness of every night without opportunity for enjoyment of the natural hours for rest and sleep? But to "exact" of the motorman under this act the latter schedule is made a penal offence, and is punishable under the act in precisely the same manner as it is punishable to "exact" more than a total of ten hours' labor in a day of twenty-four hours, to wit, by a fine of from $100 to $500. If it be urged that the latter schedule does not provide for the operation of the car during the whole night, as is provided in the former schedule, it may be replied that the maximum car service possible is continuous operation day and night for twenty-four hours; that under a requirement limiting the hours of labor of any one employee to ten hours within such twenty-four, three reliefs or changes of employees are obviously required. After deducting the ten hours during which the first motorman was employed, this leaves the fourteen hours remaining from 11 P.M. to 8 A.M. and from 1 P.M. to 6 P.M. to be divided between the two who succeed him, either seven hours to each or in any other manner not exceeding ten hours in all to either one, in such manner as must necessarily afford opportunity for rest and sleep at night to both, and without detriment to their health or to the public safety. But if the motorman who has this opportunity for sleep until 11 P.M., when he comes on duty, should work for ten hours, he would work nine of those hours until 8 A.M., when the first motorman returns, and his tenth hour would *Page 621 
be after 1 P.M., when the first motorman ceases. But since the second motorman began labor at 11 P.M. the night before, his ten hours of labor would not have been "exacted" within twelve consecutive hours, and the penalty of a fine of from $100 to $500 imposed in the act is a second time incurred. This would seem incredible if it were not literally true. To my mind such restrictions seem wholly arbitrary and unwarrantable by any considerations affecting the public safety or otherwise.
To restrict the right to labor to the twelve hours of day or night next succeeding the commencement of such labor is, in effect, to prescribe arbitrarily by law the hours of the day or night in which a man may work and those in which he may not do the same work. Under this act he can only contract for ten hours' labor in twenty-four, and he is thus restricted and deprived of the right to labor on any day, if he will, for fourteen hours of the twenty-four, or for more than half of his whole lifetime. But this last restriction makes it a penal offence if, having entered upon his ten hours of labor, he rests for more than two hours before he is required to complete his day's work.
Again, the same hours of day or night are not prescribed for all; nor does this statutory work period necessarily recur daily on the same hours for the same man. To apply the test to the motorman above supposed, this act prohibits the first, who begins labor at 6 P.M., from making a contract to labor after 6 A.M., and literally deprives him of the right to labor at his calling by day and restricts his right to labor to the hours of the night; while his successor, who does not begin labor until 11 P.M., cannot labor after 11 A.M., and must labor partly by day and partly by night. Thus, under this act, it is clear that no valid contract can be made for even ten hours' daily labor unless those ten hours are to fall within the period of twelve consecutive hours.
To impose restrictions such as these is clearly a deprivation both of liberty and of property within the provisions of article I, section 10, of the constitution.
Fifth. But in the event that labor for the period supposed *Page 622 
has been "exacted" of the street railway motorman in question, he not having a "written contract" with the company on June 1, 1902, and the labor is "exacted" on some day on which the law is in force, and not on Sunday or any other legal holiday, what is the penalty therefor provided by the act, and on whom does it fall?
Unquestionably this is a penal statute, and as such it must be construed strictly. It seeks to make a statutory offence out of an act not hitherto unlawful and not malum in se. It is elementary that statutory offences are not to be enlarged by implication, and that, unless the terms of the statute specifically include the exact offence, there can be no violation of it.
The second clause of section 1 contains the only prohibition to be found in the act, and it is as follows: "No officer or agent of any corporation operating street cars of whatever motive power shall, on any day, exact from any of its employees more than the said ten hours' work within the twenty-four hours of the natural day, and within twelve consecutive hours. Provided," etc.
The expression "natural day" which is here used is defined in Bouvier's Law Dict. sub nom. to be "The period of time elapsing between sunrise to sunset." Though the words are used in a penal statute, if it be assumed that they are intended to mean a period of twenty-four consecutive hours, whether beginning at midnight, as in the civil day, at sunrise, at noon, or at any other time (although the crime of burglary cannot be committed in the hours of the "natural day" as above defined by the authority cited), then the officers and agents of these companies are forbidden to exact labor contrary to the provisions of the statute. "Exacting" labor, and "exacting" labor only, is that which is prohibited. But what is it to "exact" labor ? In a sense, labor cannot be "exacted" of a free man. It at least and of necessity implies a demand and a compliance with that demand in some way, whether that demand be made lawfully or unlawfully, by virtue of the terms of an existing contract or by superior force. But can it be said that that which a man freely volunteers, *Page 623 
or, it may be, even desires, is, in any criminal sense, "exacted" from him? But, without further consideration of this point, it may be assumed that there has been an "exaction" of labor in any manner or by any act which the statute makes an exaction. What, then, is the consequence ?
The only penalty therefor is contained in section 3, which is as follows: "Any street railway corporation violating the provisions of the preceding sections of this act shall be fined not less than $100 nor more than $500, one-half thereof to the use of the complainant and the other half to the use of the State."
It will be observed, first, that there is no penalty for the employee who works longer than the specified term; and, second, that there is no penalty imposed upon the "officer or agent" who "exacts" the labor, the statute differing in this respect very materially from the Massachusetts statute, cap. 106, § 22, Rev. Stat., on which the act in question is apparently modeled in part, and which is as follows: "Whoever violates a provision of this chapter for which no specific penalty is provided, shall be punished by a fine of not more than $100." And the New Jersey act of 1887, upon the same subject, from which other parts of the act under consideration are evidently drawn, provides, in section 2 thereof: "That it shall be a misdemeanor for any officer or agent of any such corporation to exact," etc.
Unquestionably, under either of these acts, the officer or agent could be personally punished; but in this act, while the officer or agent is prohibited, there is no penalty provided for the punishment of the individual who so violates the act, but the penalty is visited upon the corporation only.
If it be replied that a corporation acts only through its officers and agents, and that their acts are the acts of the corporation, it may be rejoined that such is the case only when they are clothed with corporate power and are acting within the sphere of their authority and not otherwise, and that they are not presumed to so act when the statute prohibits such act to be done. But this statute always imposes a penalty upon the corporation and never upon the individual *Page 624 
offender, whether he acts by, without, or against the corporate power and instruction. And this penalty is a fine which is to be paid by the corporation, and which, of course, deprives the stockholders therein of their property by that amount. In so far as this act thus visits a penalty upon the stockholders, it is unquestionably in contravention of article I, section 10, of the constitution. But inasmuch as no fine can, in any event, ever be imposed upon the agent or officer who violates the provisions of the act, the real offender always goes unpunished and the real punishment always falls on the stockholders, even when the act has been violated in contravention of their express authority.
To the constitutionality of such legislation I cannot assent, whether it is sought to be justified as a valid exercise of the police power or as an exercise of the reserved right to alter and amend the charters of incorporation of the several companies affected thereby.
Section 2 of the act provides: "That it is the true intent and purpose of this act to limit the usual hours of labor of the employees of street railway corporations, as aforesaid, to ten hours' actual work a day, to be performed within a period of twelve consecutive hours, as aforesaid, whether such employees be employed by the trip, the job, the hour, the day, the week, or any other manner."
If the hours of labor in any lawful calling may be thus limited by law to ten in each day, beyond the power of either party to increase, if not to diminish, them, it follows that they may be limited to eight or to twelve, or to any other number of hours in like manner and with like effect; thus substituting for the constitutional right of individual liberty of contract the transient and fluctuating will of a legislative majority which both plutocrat and demagogue will unceasingly strive to control, and against which the individual will be powerless to defend — alike helpless, whether the legislative spoliation of the employer or the industrial servitude of the employee shall for the hour prevail.
And if the foregoing observations shall seem to have been directed less to the limits of the legislative power over quasi-public *Page 625 
corporations than to the limits of the same power over the citizen, it is sufficient to reply that the latter is the graver and higher question by as much as the man is above the dollar.
For the reasons above set forth, I am of the opinion that the act in question is unconstitutional in the particulars enumerated, and is wholly void. It follows from the unconstitutionality of the act, and as a necessary conclusion, that a street railway conductor, gripman, or motorman may freely contract for such hours of labor with his company as may be agreed upon between them.
JOHN TAGGARD BLODGETT.
PROVIDENCE, June 27, 1902.
OPINION TO THE SENATE.
Under the provisions of section 3 of article X of the constitution of the State, the following opinion of the justices of the Supreme Court was delivered to the Honorable Senate, March 20, 1902, in the matter of